UNITED STATES (LOCKE v.). See Case No. 8,442.

---

## Case No. 15,620.

### UNITED STATES v. LOCKMAN.

[Brunner, Col. Cas. 554;[1] 11 Law Rep. 151.]

Circuit Court, D. Massachusetts. 1848.

CRIMINAL LAW—SETTING FIRE TO VESSEL—MINOR.

1. A minor who ships on board a vessel without the knowledge of his parents may be convicted of the offense of burning a vessel on the high seas.

2. On an indictment for setting fire to a vessel on the high seas, the mere possibility that the fire might be occasioned by spontaneous combustion, or by accident, is no answer to strong probable evidence against the prisoner; in criminal cases a jury must act on strong probabilities.

This indictment charged that Lyman Lockman, on the 20th of April, 1848, "on the high seas, did wilfully and corruptly burn the ship William Thompson, of New Bedford, he, the said Lockman, then and there being a mariner on board thereof, and belonging to said ship William Thompson. And the said ship William Thompson being the property of citizens of the United States, and said Lockman not being an owner of said ship." It was founded on St. 1804, c. 40, § 1, which provides that "any person not being an owner who shall, on the high seas, wilfully and corruptly cast away, burn, or otherwise destroy any ship or other vessel unto which he belongeth, being the property of any citizen or citizens of the United States, or procure the same to be done, and being thereof lawfully convicted, shall suffer death." The fire took place at the Sandwich Islands. It appeared that the vessel, which was a whaler, in April, 1847, a few hours after she set sail for the northwest

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

coast, at about nine or ten o'clock in the evening, was found to be on fire in the forehold. She was taken back into port and found to be considerably damaged by fire. In a few weeks she was repaired and went on her voyage. Several of the crew were seized and charged with the offense, but on examination before the consul, Lockman was sent home to be tried, with two witnesses against him. The vessel arrived at New Bedford the 1st of April, 1848.

It was testified on the part of the government that a grating which separated the forecastle from the forehold, where the fire was, had been broken; that the forehold had in it a great deal of old junk, rigging, tar, etc.; that the prisoner was seen working at the bulkhead, and creeping out of the forehold through the hole; that the prisoner had said "that he had been in the forehold; that he had got some tar and rope-yarn in a sack, and would burn the ship before he would go to the northwest coast in her; that he had tried to fire the ship before, but he had only two matches, and they would not go"; that after the fire he had said that "he wished he had a spade, and he would cut off the captain's head"; that after the fire, the prisoner having been flogged to make him tell what he knew about it, he said, in reply to the question if he knew who did it, "that he did not know anything else." It also appeared that the vessel had been previously on fire, and that at that time the prisoner was confined, and two others of the crew were sent home charged with that offense; that the conduct of the captain was harsh; that the crew were also dissatisfied with their grub, and said they wished the vessel sunk or burned before they had to go in her. It was further shown that the owners acted as citizens of the United States. On the part of the prisoner it was testified that there were great complaints among the crew of the William Thompson; that they were generally dissatisfied; that several had been heard to say they would throw the captain overboard or sink the ship before they would go on to the northwest in her; that Lockman was under age, not twenty; that he shipped without the knowledge or consent of his father; and that he was quiet and orderly on board ship.

Charles L. Woodbury, for the United States.

Charles M. Ellis, for the prisoner.

THE COURT desiring the question of law in the case to be stated, the counsel for the prisoner contended that the evidence did not support the indictment, the evidence being that the prisoner was brought into the United States prior to the time alleged in the indictment; that there was no legal contract binding the prisoner to service in the ship, and therefore he did not belong to the ship under the statute, which did not apply to passengers, persons from other ships, or the

owner, but only to those holding a certain relation, that of the ship's crew; that the property of the ship could not be shown without the bill of sale, the vessel having been built by persons not then owners of her; and that the citizenship of the owners could not be shown, except by proving their birth or legal naturalization; and that the only burning punishable under the act must amount to a substantial destruction of the ship, such being the force of the words "otherwise" and "or" in the act, and its necessary grammatical construction; that the act was the same as if it read "shall destroy by casting away, burning, or any other means"; that this appeared also from the statutes from which this act is framed, and because the statutes, when intended to apply to cases of mere setting on fire, used appropriate language; and that the Case of De Londo, 2 East, P. C. p. 1098; and U. S. v. Johns [Case No. 15,481], being upon the same words, should be held to apply to this point. On the part of the government it was argued that the time was immaterial; that no proof of ownership or citizenship was required if the ship carried the American flag; that the law applied to any one on board the ship; and that the statute was only the enactment of an admiralty offense, and applied to any burning, however slight.

Upon the question of the partial burning WOODBURY, Circuit Justice, stated that if the case arose under second section of the act, the court should consider the law settled on the grounds urged by the prisoner's counsel; that his learned associate was more strongly inclined than he to the opinion that a case of partial burning would not be within the statute, which could apply only to cases of destruction of the ship; but that he could not consent, without precedent, and considering that there was some difference in the objects of the two sections, in case of a crime of so grave a character, and one which could not be reached unless by this law, to let the prisoner go free, without first having the opinion of the supreme court of the United States. He accordingly proposed to certify a division of opinion and have the cause carried up. But the prisoner, desiring to have the jury pass upon the case, the court consented, reserving for the prisoner the question of law.

The cause was then argued to the jury upon the facts. For the prisoner it was contended that there was no proof that the prisoner was guilty; that if the evidence were all taken as true, still the hemp, sails, etc., stored in the forehold might have taken fire by spontaneous combustion, and several cases were cited of like sort; or that the fire might have taken accidentally from lights in the forecastle; and that the evidence was suspicious, and if the ship was set on fire it was quite as probable, if not more so, from the evidence that the fire was set by some one besides the prisoner. The

government urged that the threats, the preparation, and the fire following showed conclusively that the prisoner was guilty.

WOODBURY, Circuit Justice, urged upon the jury the performance of their duty. The courts and juries are to administer the laws as they exist, not to make or unmake them. The jury must remember their oaths, and march up to their duty. The rule is not, as is sometimes laid down, that the jury is to be satisfied beyond doubt. The jury will not stop because it is possible that some other hypothesis than the prisoner's guilt may be true, or is consistent with the evidence. The only rule is this: The jury must be reasonably satisfied. In civil cases they must act from the mere preponderance of evidence. In criminal and capital cases they must act on strong probabilities. The jury must act in this way as they would act in any matter of their own concerns. The mere possibility that this fire might have been occasioned by spontaneous combustion, or might have been set by accident, is no answer to strong evidence, making it probable that a particular person did it. There is no doubt this was on the high seas, and the act was done to an American vessel owned by our own citizens. It is enough that the prisoner wanted employment, and went on board the ship as one of her crew, so that he belongs to her. The supreme court has just held the owners of the Lexington liable for the neglect of some of the men in a large amount. To burn "wilfully" is designedly, intentionally; "corruptly" is from a bad motive. It is not necessarily for gain or hire. For this trial any burning of the ship is sufficient to bring this case within the act. The jury will consider whether it is not likely that this fire was set by some of the crew. They will consider the testimony of the two witnesses, the fellow-shipmates of the prisoner, whose apparent fairness approves itself. They will consider who would be likely, from threats, preparation, and previous character, to have been guilty of this offense. Who had come from the house of refuge? The captain and consul were men of sense, and the jury would consider who was charged and sent home for trial, and if it was not likely that he was the guilty one. If the jury were satisfied, from the strong probabilities of the case, that all pointed to but one person, they should make an example of him. It might be painful to discharge their duty. But if the jury found the prisoner guilty, it was doubtful whether the law could reach this horrid case. This case was infinitely worse than any crime on land. There were no alarm bells, no engines, no neighbors to help. The jury, whilst they thought of the prisoner, must think of the thirty souls on board ship on that awful night. His honor dwelt on the case of the Caroline, the ill-fated Lexington, and others. There could be little doubt that the prisoner would never suffer the extreme penalty of

the law, for the executive would undoubtedly pardon.

The jury in a few moments, on the second ballot, agreed upon a verdict of not guilty.